# FREEDOM COURT REPORTING

## Page 1

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  SOUTHERN DIVISION
4  CIVIL ACTION NO. 1:05-CV-877-CSC
5
6  LISA MINTON,
7      Plaintiff,
8  vs.
9  CULLIGAN WATER, INC.,
10     Defendants.
11
12     DEPOSITION OF LISA MINTON
13     In accordance with Rule 5(d) of
14 The Alabama Rules of Civil Procedure, as
15 Amended, effective May 15, 1988, I, DONNA
16 ARMSTRONG, am hereby delivering to KEITH
17 HAMILTON the original transcript of the
18 oral testimony taken on the 24th day of
19 March, 2006, along with exhibits.
20     Please be advised that this is the
21 same and not retained by the Court
22 Reporter, nor filed with the Court.
23

## Page 2

1  DEPOSITION TESTIMONY OF:
2      LISA MINTON
3      MARCH 24, 2006
4      1:25 p.m.
5
6  COURT REPORTER: Donna Armstrong
7
8      STIPULATION
9      IT IS STIPULATED AND AGREED, by
10 and between the parties, through their
11 respective counsel, that the deposition of
12 LISA MINTON may be taken before Donna
13 Armstrong, Commissioner, Certified
14 Professional Reporter and Notary Public,
15 State at Large;
16     IT IS FURTHER STIPULATED AND
17 AGREED that the signature to and reading of
18 the deposition by the witness is waived,
19 the deposition to have the same force and
20 effect as if full compliance had been had
21 with all laws and rules of Court relating
22 to the taking of depositions;
23

## Page 3

1      IT IS FURTHER STIPULATED AND
2  AGREED that it shall not be necessary for
3  any objections to be made by counsel to any
4  questions, except as to form or leading
5  questions, and that counsel for the parties
6  may make objections and assign grounds at
7  the time of trial, or at the time said
8  deposition is offered in evidence, or prior
9  thereto.
10     IT IS FURTHER STIPULATED AND
11 AGREED that the notice of filing of the
12 deposition by the Commissioner is waived.
13
14
15
16
17
18
19
20
21
22
23

## Page 4

1      INDEX
2
3  EXAMINATION BY:    PAGE:
4  MR. HAMILTON    06
5
6
7      EXHIBITS
8
9
10 Defendant's 1    29
11 Defendant's 2    31
12 Defendant's 3    34
13 Defendant's 4    37
14 Defendant's 5    48
15
16
17
18
19
20
21
22
23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 5

```
 1        APPEARANCES
 2
 3
 4
 5    FOR THE PLAINTIFF:
 6      JOSHUA D. WILSON
 7    Wiggins, Childs, Quinn & Pantazis, LLC
 8    301 Nineteenth Street North
 9    Birmingham, AL 35203
10    (205) 328-0640
11
12
13    FOR THE DEFENDANT:
14      KEITH HAMILTON
15      CELESTE GRENIER
16    Bainbridge, Mims, Rogers & Smith, LLP
17    The Luckie Building
18    600 Luckie Drive, Suite 415
19    Birmingham, AL 35243
20    (205) 879-1100
21
22
23
```

Page 6

```
 1        I, Donna Armstrong, a Certified
 2    Professional Reporter of Birmingham,
 3    Alabama, and a Notary Public for the State
 4    of Alabama at Large, acting as
 5    Commissioner, certify that on this date,
 6    pursuant to Rule 30 of the Alabama Rules of
 7    Civil Procedure and the foregoing
 8    stipulation of counsel, there came before
 9    me at 600 Luckie Drive, Birmingham,
10    Alabama, on the 24th of March 2006,
11    commencing at 1:25 p.m., LISA MINTON,
12    witness in the above cause, for oral
13    examination, whereupon the following
14    proceedings were had:
15
16        LISA MINTON,
17    being first duly sworn, was examined and
18        testified as follows:
19
20    EXAMINATION BY MR. HAMILTON:
21      Q.  Ms. Minton, please, state your
22    full name for the record?
23      A.  Lisa Marie Minton.
```

Page 7

```
 1      Q.  Minton is your married name;
 2    right?
 3      A.  Yes, sir.
 4      Q.  What is your maiden name?
 5      A.  English.
 6      Q.  English?
 7      A.  Yes, sir.
 8      Q.  You are married to Kenneth Minton?
 9      A.  Yes, sir.
10      Q.  Have you been married to anyone
11    besides Kenneth Minton?
12      A.  Yes, sir.
13      Q.  How many other times?
14      A.  Twice.
15      Q.  Who were your former husbands?
16      A.  Jimmy Royce Haney, Mark Allen
17    Brewington.
18      Q.  Brewington?
19      A.  Brewington.
20      Q.  When were you married to Mr.
21    Haney?
22      A.  In '94.
23      Q.  For how long?
```

Page 8

```
 1      A.  Five years.
 2      Q.  Did that marriage end in divorce?
 3      A.  Death.
 4      Q.  Did you go by Haney at the time?
 5      A.  Yes, sir.
 6      Q.  And when were you married to Mr.
 7    Brewington?
 8      A.  In 1989, I believe was the year we
 9    got married.
10      Q.  How long were you married?
11      A.  Five years.
12      Q.  Did you and Mr. Brewington get
13    divorced?
14      A.  Yes, sir, we did.
15      Q.  Is he still living?
16      A.  Yes, sir, he is.
17      Q.  Where does he live?
18      A.  In Georgia.
19      Q.  Have you gone by any names besides
20    Minton, England, Haney, or Brewington?
21      A.  Yes.
22      Q.  What other names?
23      A.  Martin.
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 9

1  Q. Martin.
2  A. Yes.
3  Q. When did you go by Martin?
4  A. When I was eighteen.
5  Q. Okay. Just for a year?
6  A. For a very short time.
7  Q. Okay. What is your current
8  address?
9  A. 459 Butler Road, Dothan, Alabama,
10 36305.
11 Q. How long have you been there?
12 A. For 11-3 of '03 is when I moved
13 in.
14 Q. So a little over two years?
15 A. Yes, sir.
16 Q. Did you live in Dothan prior to
17 living on the Butler Road address?
18 A. Yes, sir.
19 Q. Where?
20 A. 1118 East Sanders Road, Dothan,
21 Alabama.
22 Q. How long were you on Sanders Road?
23 A. Approximately three years.

Page 10

1  Q. Where did you live before then?
2  A. I lived at 1604 Hodgesville Road,
3  Dothan, Alabama.
4  Q. How long were you there?
5  A. Approximately two years.
6  Q. Have you been in Dothan all your
7  life?
8  A. No, sir.
9  Q. When did you first move to Dothan?
10 A. I moved to Dothan in -- I believe
11 in the year 2000.
12 Q. Did you live in Alabama before
13 then?
14 A. Yes, sir.
15 Q. Have you lived in Alabama all your
16 life?
17 A. Yes, sir.
18 Q. What areas?
19 A. Dothan, Alabama; Ozark, Alabama;
20 and Jacksonville, Alabama.
21 Q. Where were you born?
22 A. In Ozark, Alabama.
23 Q. Were you raised there?

Page 11

1  A. For the most part of my life, yes,
2  sir.
3  Q. Where did you go to high school?
4  A. Carroll High.
5  Q. Did you graduate?
6  A. No, sir.
7  Q. How long did you --
8  A. Tenth grade.
9  Q. Tenth grade. Have you taken any
10 GED courses or trade courses or anything
11 like that?
12 A. I did go to Southeast Alabama
13 Skill Center.
14 Q. Okay.
15 A. Yes, sir.
16 Q. How long?
17 A. Eight week course.
18 Q. On what?
19 A. CDL, to obtain a CDL.
20 Q. Did you get your CDL?
21 A. Yes, sir.
22 Q. What class?
23 A. Class A.

Page 12

1  Q. What is your date of birth?
2  A. 10-6-66.
3  Q. What is your Social Security
4  number?
5  A. 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.
6  Q. I'm sorry, I was asking you about
7  your addresses in Dothan. You have moved
8  to Dothan in 2000, around 2000?
9  A. Yes, sir.
10 Q. We have Hodgesville Road, East
11 Sanders Road, your current address on
12 Butler Road, anywhere else you lived in
13 Dothan?
14 A. I lived in an apartment for a
15 short time, but I can't remember that
16 address.
17 Q. What apartments?
18 A. It was Tanglewood.
19 Q. Okay. Was that everything in
20 Dothan?
21 A. Yes, sir, to the best of my
22 knowledge.
23 Q. Who lives with you at the Butler

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 13

1  Road address? I assume your husband does?
2    A.  Kenneth and Vivian, my daughter.
3    Q.  Vivian, your daughter. How old is
4  she?
5    A.  She is three.
6    Q.  Okay.
7    A.  And then I have got Mark and
8  Mason. And Mason is thirteen and Mark is
9  fifteen and then Amber lives there somewhat
10  of the time.
11    Q.  Who is Amber?
12    A.  That's my husband's daughter.
13    Q.  How old is she?
14    A.  She is fourteen.
15    Q.  Do you have any adult children?
16    A.  No, sir.
17    Q.  Does your husband have any adult
18  children?
19    A.  No, sir.
20    Q.  Do you have any adult step
21  children, I mean, from prior marriages or
22  anything?
23    A.  Yes, sir.

Page 14

1    Q.  Okay. Where are they? Are any of
2  them in Alabama?
3    A.  Yes, sir.
4    Q.  Okay. Tell me who they are?
5    A.  Robert Lee Haney.
6    Q.  Where is he?
7    A.  He lives in Slocomb, Alabama.
8    Q.  Where is -- what county, do you
9  know?
10    A.  Geneva County.
11    Q.  Geneva County?
12    A.  Yes, sir.
13    Q.  Is Robert Lee Haney married?
14    A.  No, sir.
15    Q.  When you were married to his
16  father, did you adopt Robert or were you
17  just a stepmother?
18    A.  I was just a stepmother.
19    Q.  Do you have any other adult step
20  children?
21    A.  No, sir.
22    Q.  Any adopted children?
23    A.  Vivian.

Page 15

1    Q.  Vivian is adopted. Okay.
2    A.  Yes, sir.
3    Q.  How long have you and Mr. Minton
4  been married?
5    A.  About nine and a half years.
6    Q.  Other than the people we have
7  talked about, do you have any relatives in
8  Houston County?
9    A.  No, sir.
10    Q.  What about in the Ozark area?
11    A.  No, sir.
12    Q.  Or Jacksonville?
13    A.  Yes, sir.
14    Q.  Your folks still there or are they
15  --
16    A.  No, sir, that's my sister's -- my
17  two sisters and my brother. My parents are
18  deceased.
19    Q.  Okay. Two sisters and a brother.
20  What are their names?
21    A.  John English.
22    Q.  Okay.
23    A.  Susan Holland. And Donna Bryant.

Page 16

1    Q.  Bryant?
2    A.  Yes, sir.
3    Q.  Are they all married?
4    A.  My brother is married.
5    Q.  What is his wife's name?
6    A.  Deborah English.
7    Q.  What about Susan?
8    A.  Susan is widowed.
9    Q.  Okay.
10    A.  And Donna is divorced.
11    Q.  Okay. And they are all in the
12  Jacksonville area?
13    A.  Yes, sir.
14    Q.  Do any of them have adult
15  children?
16    A.  Yes, sir.
17    Q.  Bunch of them?
18    A.  Donna has -- no -- yes, my brother
19  has three.
20    Q.  Okay. What are their name?
21    A.  John English, Christy English,
22  Jamie English, Sean Williamson, and
23  Danielle Holland.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 17

1  Q. Okay. Those are all of the adult
2  nieces and nephews that you have?
3  A. Yes, sir.
4  Q. Where is your husband from?
5  A. Virginia.
6  Q. Okay. Do you have any in-laws in
7  Alabama?
8  A. No, sir.
9  Q. Good. Are you employed today?
10  A. No, sir.
11  Q. What is the last job you held?
12  A. Wiley Sanders.
13  Q. Wiley Sanders?
14  A. Yes, sir.
15  Q. What is the actual -- full name of
16  that company?
17  A. Wiley Sanders Truck Line.
18  Q. Did you drive for them?
19  A. Yes, sir.
20  Q. How long were you employed?
21  A. Approximately two months.
22  Q. I understand that you didn't work
23  full-time; is that right?

Page 18

1  A. Yes, sir, that's right.
2  Q. What was your schedule?
3  A. Well, the reason -- the schedule
4  was on I would go out and work and stay
5  gone for several weeks at a time, but the
6  reason I was allowed to do this is because
7  my children were out of school. So that
8  was a temporary job.
9  Q. Just for the summer?
10  A. Yes, sir.
11  Q. When the kids went back to school,
12  did you have to quit?
13  A. Yes, sir.
14  Q. You were not terminated?
15  A. No, sir.
16  Q. Prior to working for Wiley
17  Sanders, what was your job?
18  A. Prior to Wiley Sanders was
19  Wiregrass Transit.
20  Q. That's in Dothan?
21  A. Yes, sir.
22  Q. What did you do for them?
23  A. I drove a bus, a transit bus.

Page 19

1  Q. Oh, that's the transit authority?
2  A. Yes, sir.
3  Q. How long were you with Wiregrass
4  Transit?
5  A. If my calculations are right,
6  approximately three years.
7  Q. Okay. What period of time?
8  A. From 2000 to 2003, I believe is
9  the years.
10  Q. Around when in '03 did you leave
11  that job?
12  A. I believe it was in October, sir,
13  in October.
14  Q. So from October of '03 until the
15  summer of '05 you were not employed at all?
16  A. No, sir.
17  Q. Did you have any means of income?
18  A. My husband.
19  Q. But none that you brought in. No
20  odd jobs or anything like that?
21  A. No, sir.
22  Q. Baby sitting, any of that sort of
23  stuff?

Page 20

1  A. Now, throughout the years I have
2  done a little babysitting here and there.
3  Q. Okay.
4  A. But as far as a regular job, no,
5  sir.
6  Q. Were you trying to get employment
7  between October of 2003 and January of '05?
8  A. January -- January is when I
9  started seeking employment.
10  Q. Obviously, we're going to get to
11  January and talk about that in a second.
12  I'm just trying to fill in the gap.
13  A. Okay.
14  Q. So between October of '03 when you
15  left Wiregrass Transit and January of '05
16  when you began seeking employment, you
17  weren't actively looking for a job?
18  A. No, sir.
19  Q. Why did you leave Wiregrass
20  Transit?
21  A. To be with Vivian.
22  Q. Okay. I didn't write it down, is
23  she the three year old?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 21

1    A. Yes, sir, she's three years old.

2    Q. Other than drive for Wiley

3 Sanders, what did you do? I mean, did you

4 load and unload the trucks or was it just

5 you drive and someone else would unload the

6 trucks?

7    A. Yes, sir, someone else would

8 unload the truck.

9    Q. Would you help?

10    A. No, sir.

11    Q. Prior no going to work for

12 Wiregrass Transit, what did you do?

13    A. Wiregrass Transit, I worked with

14 MDS, that's Morristown Driver Service and

15 that is also a trucking company.

16    Q. Okay. Is that like a temp

17 trucking agency that clients would call and

18 they need a driver for something?

19    A. No, sir. It is a regular trucking

20 company.

21    Q. Okay. How long were you with MDS?

22    A. Approximately four months.

23    Q. In 2000?

Page 22

1    A. Yes, sir.

2    Q. What happened there? Why did you

3 leave?

4    A. Children was the main reason and

5 then that's when I come home and went to

6 work for Wiregrass Transit.

7    Q. Where were you? Where was MDS?

8    A. MDS was located out of Morristown,

9 Tennessee.

10    Q. Okay. Have you ever held any kind

11 of sales position?

12    A. Yes, sir, I have.

13    Q. Tell me about that. More than

14 one?

15    A. Yes, sir, I have.

16    Q. Tell me about those.

17    A. Okay. I have worked for Schwan's

18 Fine Foods.

19    Q. Where is Schwan's located?

20    A. The home office I do believe is

21 located in Montgomery, Alabama. I worked

22 out of Gadsden, Alabama.

23    Q. When was this?

Page 23

1    A. This was in '99. I'm not quite

2 sure on my dates, but my husband was killed

3 in '98. It was the end part of '98 through

4 '99.

5    Q. Okay. And what exactly did you do

6 for Schwan's?

7    A. I drove a route truck and I also

8 was new sales. I went out and made new

9 sales for the company and a new sales --

10 you know, I would go out and I would make

11 the new sales for them and produce sales

12 for the gentleman's route. And then I was

13 also a relief route driver. I would drive

14 the trucks when one of the route gentleman

15 were out. And then eventually it got to

16 where I just drove my own route truck.

17    Q. Okay. Were there any other women

18 at Swan's doing driving jobs or route jobs?

19    A. Throughout the whole company?

20 Yes. In Gadsden, I don't believe there

21 was.

22    Q. What sort of physical requirements

23 did that job have?

Page 24

1    A. Stooping, bending, lifting.

2    Q. Heavy lifting?

3    A. Yes.

4    Q. How much?

5    A. I'm not sure of the -- of the

6 exact weight amount, but, you know, you

7 would have the frozen food products, ice

8 cream, boxes of ice cream, that you would

9 have to put on your truck that you would

10 pull off of your truck.

11    Q. Was that a regular part of your

12 day was pulling off and lifting boxes of

13 frozen ice cream?

14    A. Yes, sir, and food and this was an

15 all day process.

16    Q. Would you say that the heavier

17 items weighed in the range of forty or

18 fifty pounds or more?

19    A. Yes, sir. I'm sure that once you

20 pulled off -- like you would have to pull

21 someone's order. Let's say that they

22 ordered three gallons of ice cream. They

23 ordered three pizza's, a box of the noodle

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 25

1  beef noodles, so forth and so on. Then you
2  would have to pull all of this off the
3  truck, put it in the box, and tote it in.
4      Q.  All right. What other route sales
5  type positions such as what you had at
6  Schwan's did you have?
7      A.  I worked with Made-Right Sandwich
8  Company. I worked with them in part of the
9  '99, 2000. I worked for them for
10  approximately five to six months and that's
11  when I moved back home from Jacksonville.
12      Q.  Is that why you left to move back
13  home?
14      A.  Yes, sir.
15      Q.  Why did you leave Schwan's, I
16  don't think I asked you that?
17      A.  I left Schwan's because I was
18  working -- after my husband died, I devoted
19  all my time into working to ease things.
20  And I was working so many hours, never no
21  time with my children. So with the
22  Made-Right Sandwich Company I would not
23  have to put in as many hours. I was

Page 26

1  staying with my brother and his wife in
2  their home in Jacksonville and I would work
3  anywhere from 9:00 to 10:00 o'clock at
4  night. When I would get home, my children
5  would be asleep and then I would get up
6  early, 4:00, 5:00 o'clock the next morning,
7  and go do it again.
8      Q.  Just got to be too much?
9      A.  Right. Well, it got to be where I
10  wanted to spend some more time with my
11  children. So I could do less hours with
12  Made-Right. I could run my route, get my
13  stores completed, and if I did it in -- if
14  I did it in six hours, then I was at home.
15  If it took me eight hours, you know,
16  whatever it took me, but I could run my
17  route, do what I was supposed to do. As
18  soon as my stores was served I was able to
19  come home.
20      Q.  Have you ever sought workers'
21  compensation benefits?
22      A.  Yes, sir, I have.
23      Q.  How many times?

Page 27

1      A.  One.
2      Q.  When was that and what was it for?
3      A.  It was in 1993, I believe was the
4  year and -- '93, '94, and it was from where
5  I was making tents with Teledyne and I had
6  to have surgery here and here (indicating).
7      Q.  Making tents?
8      A.  Making a type of tent for Teledyne
9  in Slocomb, Alabama.
10      Q.  Did you get cut?
11      A.  No, sir. This is where the doctor
12  cut me. (Indicating).
13      Q.  Oh, okay, you had surgery. Did
14  you hurt your elbow or something?
15      A.  Yes.
16      Q.  Has that limited your ability to
17  perform physical work?
18      A.  No, sir.
19      Q.  Have you ever been put on any sort
20  of physical restrictions from work other
21  than obviously after you had that surgery
22  you couldn't do certain things for a while,
23  but other than that, have you ever been put

Page 28

1  on restrictions by a doctor?
2      A.  No, sir.
3      Q.  Do you have any physical
4  disabilities?
5      A.  No, sir.
6      Q.  Have you ever?
7      A.  Well, I have had the -- this
8  (indicating). I have this disability
9  (indicating).
10      Q.  For the record, since the court
11  reporter is putting it down. You are
12  referring to your forearm area and elbow?
13      A.  This is carpal tunnel, okay? But
14  I don't know exactly what they called this.
15  Cubical tone syndrome or something. I
16  don't know exactly what they called this.
17      Q.  Was it a repetitive stress injury
18  like carpal tunnel?
19      A.  Yes, that's what this was, yes,
20  sir.
21      Q.  Was the elbow ding as well?
22      A.  Something had popped out of --
23  something had popped somewhat in here and

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 29

1  he had to go in here and there is a
2  specific name for it, sir, I just don't
3  know that name.
4      Q.  I'm just trying to get a general
5  idea of what it is.
6      A.  Something had popped in here and
7  he had to go in there and repair that.
8      Q.  That happened, though, before you
9  had the job with Schwan's that required you
10 to lift the relatively heavy boxes?
11     A.  Yes, sir.
12     Q.  Did you ever have any incidence,
13 any physical problems resulting from your
14 toting the boxes around from Schwan's?
15     A.  No, sir.
16
17     (Whereupon, Defendant's
18     Number 1 was marked for
19     identification purposes and
20     attached to the deposition.)
21
22     Q.  Let me get some of these papers
23 out of the way. Defendant's Exhibit 1 is

Page 30

1  titled first amended complaint and it is
2  the first amended complaint in this case.
3  And I will show it to you and I will ask
4  you whether you have seen that document
5  before today? You're welcome to look
6  through it.
7      A.  This is the -- this is the
8  complaint?
9      Q.  Well, it is not the original
10 complaint. It was an amended complaint.
11 So, yes, just not the original complaint?
12     A.  Oh, okay. Yes, sir.
13     Q.  Would you, please, look at the
14 bottom of page two under factual
15 allegations starting with paragraph nine
16 and continuing until the following page of
17 paragraph fifteen?
18     MR. WILSON:  Read it.
19     THE WITNESS:  Okay.
20     MR. WILSON:  No, not --
21     Q.  You don't have to read it out
22 loud. I just want you to familiarize
23 yourself with it. Just take your time.

Page 31

1  Let me back up for a second. You didn't
2  actually prepare this document yourself;
3  right?
4      A.  No, sir.
5      MR. WILSON:  Object to the form of
6  the question, but that's fine.
7      Q.  The information alleged in
8  paragraph's nine through fifteen, is that
9  information that came from you?
10     A.  Yes, sir.
11
12     (Whereupon, Defendant's
13     Number 2 was marked for
14     identification purposes and
15     attached to the deposition.)
16
17     Q.  Let me go on to Defendant's
18 Exhibit 2, which is a copy of the
19 discrimination with the EEOC. It's not a
20 great copy, but you can probably recognize
21 everything on it. You have seen that
22 document before, Ms. Minton?
23     A.  Yes, I have.

Page 32

1      Q.  Is that your EEOC charge?
2      A.  Uh-huh.
3      Q.  You have to say yes for the court
4  reporter.
5      A.  Yes.
6      Q.  Who prepared that document?
7      MR. WILSON:  I'm going to object
8  to any attorney/client privilege this may
9  get into.
10     Q.  Yeah, and I don't want to get into
11 anything that's privileged. For now, I
12 just want to know who prepared it. Who
13 typed it?
14     A.  My attorney.
15     Q.  Did you provide the information
16 that is included in this, particularly
17 under where it says the particulars are and
18 then there are six numbered paragraphs?
19     A.  Yes, sir.
20     Q.  Did you sign it at the bottom
21 where it says charging party signature?
22     A.  Yes, sir.
23     Q.  Does that say Lisa M. Minton?

8  (Pages 29 to 32)

# FREEDOM COURT REPORTING

Page 33

1      A.  Yes, sir.
2      Q.  And you signed it on February 10th
3  of '05?
4      A.  Yes, sir.
5      Q.  Do you see right above that where
6  it says I declare under penalty of perjury
7  that the foregoing is true and correct?
8      A.  Yes, sir.
9      Q.  Had you read that language before
10  you signed it?
11      A.  Read what was right here, sir?
12  One through six?
13      Q.  Well, actually -- yes, I will ask
14  you that question.  I was really asking did
15  you -- were you aware that -- you were
16  declaring under the penalty of perjury that
17  the foregoing is true and correct?
18      A.  This is true and correct.
19      Q.  And that is based on your own
20  information?
21      A.  Yes, sir.
22
23          (Whereupon, Defendant's

Page 34

1          Number 3 was marked for
2          identification purposes and
3          attached to the deposition.)
4
5      Q.  Defendant's Exhibit 3 is entitled
6  plaintiff's initial disclosures in this
7  case.  Have you seen that document before,
8  Ms. Minton?
9      A.  Yes, sir.
10      Q.  Who is Michelle Potter?
11      A.  She is a close friend.
12      Q.  Where does she live?
13      A.  Ozark, Alabama.
14      Q.  What does she do for a living?
15      A.  She is in child care.
16      Q.  What do you mean?
17      A.  She works at a child care
18  facility.
19      Q.  Like a daycare center?
20      A.  Yes, sir, she is a teacher there.
21      Q.  Which one?
22      A.  I don't know the name of the
23  daycare.

Page 35

1      Q.  How do you know her?
2      A.  Her mother and -- her mother and
3  father and my mother and father were raised
4  up together and we have just all been
5  raised up together.
6      Q.  Okay.  So you have known her most
7  of your life since you were a child?
8      A.  Yes, sir.
9      Q.  I presume then Mr. Paul Potter is
10  Michelle Potter's husband?
11      A.  Yes.
12      Q.  How long have you known him?
13      A.  I have known Paul since -- let me
14  think, approximately around '96.  1996.
15      Q.  Okay.  Michelle and Paul Potter
16  are identified in Defendant's Exhibit 3 as
17  individuals who are believed to have
18  discoverable personal knowledge concerning
19  the factual issues raised in your
20  complaint.  I have an affidavit -- there is
21  an affidavit attached to Defendant's
22  Exhibit 3 of Michelle Potter.  I have
23  reviewed it and can you tell me whether

Page 36

1  there is other information that you are
2  aware of that Michelle Potter or that you
3  believe Michelle Potter may have about this
4  case other than what is stated in her
5  affidavit?
6      A.  Not to my knowledge, no, sir.
7      Q.  Now, what information would you
8  think Paul Potter would have about this
9  case?
10      A.  It is going to be in connection
11  with what, you know, Michelle has discussed
12  with her husband.
13      Q.  Okay.  But nothing then -- no
14  direct knowledge about --
15      A.  No.
16      Q.  Let me ask it this way.  I think
17  you just answered the question.  I just
18  want to make sure.  Anything Paul Potter
19  knows about this case, he has heard from
20  somebody else?
21      A.  To my knowledge.
22      Q.  Okay.  What about Kenneth Minton,
23  what about your husband?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 37

1  A.  That is my --
2  Q.  Would the same go for him?
3  Anything he knows about it he has heard
4  from you or from Michelle?
5  A.  Yes, to my knowledge.
6  Q.  To your knowledge?
7  A.  (Witness nods head.)
8  Q.  So Mr. Minton and Mr. Potter don't
9  have any, to your knowledge, direct
10  information, direct knowledge about this
11  case?
12  A.  That is correct, sir.
13
14  (Whereupon, Defendant's
15  Number 4 was marked for
16  identification purposes and
17  attached to the deposition.)
18
19  Q.  Okay.  I'm done with that one.
20  Defendant's Exhibit 4 is titled plaintiff's
21  response to defendant's interrogatories and
22  requests for production.  Your signature
23  appears on page ten of that document; is

Page 38

1  that correct?
2  A.  Yes, sir.
3  Q.  Have you read the answers to the
4  interrogatories?  And did you provide the
5  information in those?  I'm not talking
6  about the objections that your lawyers have
7  asserted, but the actual factual
8  information?
9  A.  Yes, sir.
10  Q.  That's from you?
11  A.  Yes, sir.
12  Q.  Is it all true?
13  A.  Yes, sir.
14  Q.  Where else has Mr. Minton worked
15  in the last five years besides Perdue
16  Farms?
17  A.  Alabama Motor Express.
18  Q.  Where are they based?
19  A.  Dothan, Alabama.
20  Q.  He was a driver for them?
21  A.  Yes, sir.
22  Q.  Anywhere else?
23  A.  Yes, he has worked for Tommy and

Page 39

1  Kathy Coggins.
2  Q.  What is that?
3  A.  Maintenance repair.
4  Q.  I understand that you are the
5  plaintiff in a pending lawsuit against,
6  Tommy and Kathy Coggins?
7  A.  Yes, sir, I am.
8  Q.  That lawsuit is in Houston County,
9  Alabama?
10  A.  Yes, sir.
11  Q.  What is that case about?
12  A.  It is where our home had been --
13  the roof needed to be replaced on our home
14  and it had been foregoing for some time and
15  eventually it just -- water was pouring
16  into the home and it caused an accident.
17  Q.  What do the Coggins have to do
18  with that case?
19  A.  Because they -- first, they own
20  the home.
21  Q.  They are the landlords?
22  A.  Yes, sir.  And second, they --
23  when the trailer was placed there, Mr.

Page 40

1  Coggins was told to put a roof on the
2  mobile home.
3  Q.  Okay.
4  A.  He was advised to put a roof on
5  the mobile home.
6  Q.  Where is that home?
7  A.  1118 East Sanders Road.
8  Q.  What is the current status of that
9  lawsuit?
10  A.  Pending.
11  Q.  Is it set for trial?
12  A.  I'm not -- I don't know, sir.
13  Q.  Who is your lawyer is in that?
14  A.  Kerry N. Hamner.
15  Q.  Are there other defendants besides
16  the Coggins?
17  A.  Could you rephrase the question?
18  Q.  Who are defendants in that case?
19  I know Tommy Coggins is a defendant; right?
20  A.  Right.
21  Q.  Or Kathy Coggins?
22  A.  Right.
23  Q.  Is there anyone else or any

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 41

1 entity, any company that is a defendant?
2      MR. WILSON: That you know of.
3      A. Not that I know of.
4      Q. Just those two as individuals?
5      A. I'm assuming.
6      Q. Have you been a party to any other
7 lawsuits of any kind in the past ten years?
8      A. Yes.
9      Q. What else?
10      A. I had the -- the court -- the
11      Q. Teledyne?
12      A. Teledyne.
13      Q. You have that listed here.
14 Workers' comp claim.
15      A. Yes.
16      Q. We are not talking about this
17 case. Obviously, I know about this case.
18 Anything else?
19      A. I have been -- I have been sued
20 twice.
21      Q. What were those about?
22      A. One is a bill from Southeast
23 Alabama Medical Center and one was a -- the

Page 42

1 City of Dothan trash pick up.
2      Q. What was the result of Southeast
3 Alabama Medical Center case?
4      A. It is still pending.
5      Q. How much is that bill?
6      A. I'm not exactly sure, sir.
7      Q. What is your best guess?
8      A. I think it was twelve hundred
9 dollars, but I'm not -- there is several
10 bills and I'm not exactly sure, sir.
11      Q. Do you dispute that you owe the
12 money that's being sought by the hospital?
13      A. No, sir, I dispute on -- my
14 husband carries insurance on me and that
15 insurance should be paying part of that
16 claim.
17      Q. Who is the insurance company?
18      A. Accordia. Accordia. I believe
19 I'm saying that right.
20      Q. I think that's right. Are they
21 part of that lawsuit, the Southeast Alabama
22 Medical Center lawsuit or is the suit just
23 against you?

Page 43

1      A. Just against me.
2      Q. Have you submitted the claim to
3 the insurance company?
4      A. The hospital submitted the claim
5 to the insurance company.
6      Q. And I take it that was denied?
7      A. Right.
8      Q. Have you protested that decision
9 with the insurance company?
10      A. I have brought it to their
11 attention, but nothing has been done about
12 it.
13      Q. And you said that claim is still
14 pending?
15      A. Yes, sir.
16      Q. What did you do to make the
17 garbage company mad at you?
18      A. I didn't know that -- when we
19 moved into 459 Butler Road, the trash
20 people just kept picking the trash up.
21 Well, I thought that was included with Mr.
22 Gilly. But it was not so it had been
23 adding up and adding up and adding up.

Page 44

1      Q. You didn't know that you were
2 supposed to be paying for the trash pick
3 up?
4      A. Yes, sir.
5      Q. And they were just picking it up?
6      A. Yes, sir. So now I owe for that
7 trash pick up, sir.
8      Q. And -- how much do you owe?
9      A. I'm not exactly sure. I think it
10 is, like, a hundred and fifty dollars.
11      Q. Mr. Gilly, I take it, was there
12 before you?
13      A. Mr. Gilly is the actual owners of
14 the property.
15      Q. Okay. You know, I was getting the
16 Sanders Road, the Coggins property mixed up
17 with the -- Gilly is the owner of the
18 property where you live right now?
19      A. Yes, sir.
20      Q. Other than the complaint, charge,
21 against my client, have you ever filed a
22 discrimination charge with the EEOC or in
23 court?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 45

1    A.  No, sir.

2    Q.  You gave a deposition I see two

3  days ago?

4    A.  Yes, sir.

5    Q.  And that was in the Coggins' case?

6    A.  Yes, sir.

7    Q.  Is your husband a party in that

8  case?

9    A.  No, sir.

10    Q.  Who is on the lease?  Who was on

11  the lease?

12    A.  We didn't sign a lease at that

13  time.

14    Q.  Why are you the only plaintiff in

15  this case?

16    A.  Because I'm the one that slipped

17  and fell in the water.

18    Q.  I didn't pick up on that part of

19  it.  So did you suffer an injury for that

20  when you slipped and fell?

21    A.  Yes, sir, I did.

22    Q.  What injury?

23    A.  It's a pinched nerve.

Page 46

1    Q.  When did that happen?

2    A.  Let me think.  October the 26th, I

3  believe was the date.

4    Q.  Of what?

5    A.  2003.

6    Q.  Okay.  Right before you moved?

7    A.  Yes.

8    Q.  We know why you moved, I guess,

9  the roof fell in?

10    A.  Just about it, yes, sir.

11    Q.  Where is the pinched nerve?

12    A.  Into this part of my neck right

13  here (indicating).

14    Q.  Okay.  You're pointing to the

15  right side of your neck where it comes into

16  your shoulder?

17    A.  Right there (indicating).

18    Q.  Okay.  Does that still bother you?

19    A.  Yes, at times, it can.  Most of

20  the times it's fairly decent.  There is

21  sometimes that it will give -- it will give

22  a little aggravation, pain.

23    Q.  What causes it to flare up?

Page 47

1    A.  Nothing in particular.  It can be

2  as little as sitting there, waking up and

3  going to sit in a chair.  You might have

4  slept wrong.  Or I guess it is whenever it

5  decides it wants to do something.  But most

6  of the time when I wake up, I guess from

7  where I sleep a certain way.

8    Q.  So it is sore when you wake up or

9  does it pinch or burn?

10    A.  It is kind of like a little pinchy

11  feeling.  Like a little, you know, pinchy

12  feeling.

13    Q.  What about when you are engaged in

14  some kind of physical activities, are there

15  kinds of things that cause it to bother you

16  more than others?

17    A.  No, sir, because I'm physical all

18  the time.  I have five kids.

19    Q.  Lifting your three year old

20  doesn't exacerbate any problem there?

21    A.  No, sir.

22

23    (Whereupon, Defendant's

Page 48

1    Number 5 was marked for

2    identification purposes and

3    attached to the deposition.)

4

5    Q.  Defendant's Exhibit 5 is titled

6  renotice of taking deposition.  Have you

7  seen this document before?

8    A.  If I have, sir, I don't remember

9  it.

10    Q.  Did you bring any documents with

11  you today to this deposition?

12    A.  No, sir, I didn't.

13    Q.  Were you asked to?

14    A.  No, sir.

15    Q.  Have your 2005 tax returns been

16  completed?

17    A.  Yes, sir, they have.

18    Q.  Have they been filed?

19    A.  Yes, sir, they have.

20    Q.  And that's this years.  I mean,

21  that's the ones to be filed that are due in

22  April, just to be clear?

23    A.  Yes, sir, they have.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 49

1    Q.  Would you, please, get a copy of
2    those to your lawyer so that he can get
3    them to me?
4        A.  Yes, sir, I will.
5        Q.  Other than with my client and with
6    Wiley Sanders Trucking, have you applied
7    for any positions since January 1st of
8    2005?
9        A.  I applied for Pepsi Cola in
10   Dothan.
11       Q.  To do what?
12       A.  To -- to ride around with a sales
13   person to do the snack vending.
14       Q.  So it wasn't a driving position as
15   well?
16       A.  Not at that time.  It would have
17   developed into a driving position.
18       Q.  Okay.  Sort of like a route sales
19   job?
20       A.  Correct.
21       Q.  What is the name of that company?
22       A.  Pepsi Cola.
23       Q.  Is it --

Page 50

1        MR. WILSON:  Might be Buffalo
2    Rock.  Is that who owns it?
3        THE WITNESS:  Yes, sir, it is.
4        Q.  Buffalo rock?
5        A.  Yes, sir.  Yes, sir.
6        Q.  They have a Dothan office, did you
7    go in there and apply or did you mail an
8    application in or what?
9        A.  I went into the office and
10   applied.
11       Q.  When did this happen?
12       A.  I'm not -- I don't have the dates,
13   sir.
14       Q.  Approximately when?
15       A.  I just -- I don't know, sir.  I do
16   have it written down at home, but I do not
17   have that with me today, sir.
18       Q.  Was it before or after you went
19   into Culligan of the Wiregrass?
20       A.  After.
21       Q.  Was it before or after you applied
22   with Wiley Sanders?
23       A.  After.

Page 51

1        Q.  So it was some time after the
2    summer?
3        A.  Yes.
4        Q.  What was the result of that
5    application?
6        A.  I didn't get hired.
7        Q.  Did you get interviewed?
8        A.  Yes, sir, I did.
9        Q.  Who interviewed you?
10       A.  I don't have his name with me
11   today either.
12       Q.  Did they call and tell you you
13   weren't hired or did you just never hear
14   back from them after the interview?
15       A.  I called them and asked what the
16   status was and she told me that I did not
17   make it for that position and that he was
18   keeping me -- keeping my name for some
19   other type of position, but I can't
20   remember what she said that name was.
21       Q.  Did she explain why you did not
22   make it for that position?
23       A.  No, sir, I didn't ask.

Page 52

1        Q.  Do you know who received the
2    position for which you applied?
3        A.  No, sir, I don't.
4        Q.  Do you know the gender of the
5    position who received the position?
6        A.  No, sir, I don't.
7        Q.  Do you feel like you were
8    discriminated against by Buffalo Rock?
9        A.  No, sir, I don't.
10       Q.  Any other applications for 2005 or
11   the first of this year?
12       A.  Not to my knowledge.
13       Q.  What do you mean?
14       A.  There were -- I mean, I had
15   applied -- there was this other place, but
16   it wasn't -- like a telephone books is what
17   I had done.  But it was not like a job,
18   job, if that makes any sense.  You could --
19   you could go and you could put the
20   telephone books out, but you wasn't hired
21   for the job.  Does that make any sense?
22       Q.  Did you get paid for it?
23       A.  Yes.  She would pay you, but she

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 53

1   would not pay you -- it was -- it was --
2   you would get paid for the number of books
3   that you put out, but you would not get,
4   like -- it was just like a check that I
5   would write from me to you.
6       Q.  Okay.  Who was the person that you
7   spoke to about that?
8       A.  Her name was Lori, but I don't
9   know her last name, but I do have that at
10  home as well.
11      Q.  Why don't you get that to your
12  lawyer so he can provide it to me?
13      A.  Yes, sir.
14      Q.  When did you talk with Lori?  Just
15  use the Wiley Sanders job as a point of
16  reference.  Before or after?
17      A.  After this.
18      Q.  Did you fill out a written
19  application?
20      A.  No, sir.
21      Q.  Was this just somebody that you
22  heard about and talked to?
23      A.  Yes, sir.

Page 54

1       Q.  Did you talk on the phone or did
2   you talk in person?
3       A.  Both.
4       Q.  And what happened?  What was the
5   result of those talks?  Did you actually do
6   the phone book job?
7       A.  Yes, sir.
8       Q.  Oh, okay.  Is that listed in your
9   interrogatory answers?  It doesn't look
10  like it.  Did you receive pay for that job?
11      A.  Yes.  She would -- she would --
12  she would pay you a little of something to
13  put the -- what the pay mainly was for
14  because you had to use your own vehicle.
15  So she was more or less paying you to --
16  she was more or less paying you for the gas
17  that you used, but a little bit above the
18  gas, if that makes any sense.  As high as
19  gas prices was, it was equalling out that
20  you were pretty much taking care of your
21  gas and it is not something that I would
22  ever do again.
23      Q.  How long did you do that?

Page 55

1       A.  For a couple of weeks.
2       Q.  How much did you get?
3       A.  A few hundred dollars.
4       MR. WILSON:  Keith, let me -- you
5   had asked for her tax records.  I think we
6   provided those and I think that's in there.
7       MR. HAMILTON:  The current ones?
8       MR. WILSON:  Yes, and I think it
9   has got the Directory Distributing.  Is
10  that who it was?
11      THE WITNESS:  Yes.
12      MR. HAMILTON:  Okay.
13      MR. WILSON:  Directory
14  Distributing.  I have got them right here
15  if you want to look at them.
16      MR. HAMILTON:  Let's go off the
17  record for a second.
18
19      (Off-the-record discussion.)
20
21      Q.  Okay.  The Lori you were talking
22  about was with Directory Distributing; is
23  that right?

Page 56

1       A.  That is correct, that is the name.
2       Q.  Have you applied for any other
3   jobs other than the ones we have talked
4   about since --
5       A.  No, sir.
6       Q.  -- since the beginning of '05?
7       A.  No, sir.
8       Q.  Have you gone into a -- or phoned
9   a business to inquire about jobs?
10      A.  Yes, sir, I have done that.  I
11  have phoned the Alabama Employment Office.
12  I have went on line with the Alabama
13  Unemployment Office.  I have -- I have made
14  a phone call to Coca-Cola Bottling Company
15  and there was one more and I cannot
16  remember the name.  But I had opened the
17  phone book one day and I was, like, I'm
18  going to get -- this is what is going to
19  happen today and I called to check on some
20  jobs and I do not know that one's name.
21      Q.  Are you looking for a route sales
22  type job?
23      A.  Yes, sir, I am.  That's what I

14  (Pages 53 to 56)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 57

1  enjoy.
2      Q.  And one that you can use your
3  class A commercial driver's license in?
4      A.  Yes, sir.
5      Q.  And make some sales calls and
6  deliveries?
7      A.  Yes, sir, something local.
8      Q.  Right.  I understand from my
9  client that you have now submitted an
10  actual application?
11      A.  Yes, sir.
12      Q.  And you have an interview
13  scheduled?
14      A.  He and I are supposed to meet up
15  -- supposed to talk, excuse me, on Tuesday.
16      Q.  This coming Tuesday?
17      A.  Yes, sir.
18      Q.  And by he you mean Jay Trumbull?
19      A.  Yes, sir.
20      Q.  Has he discussed with you what
21  positions are available?
22      A.  Yes, sir.
23      Q.  Tell me about that.

Page 58

1      A.  He told me that he had a route
2  sales position open in Panama City and he
3  also told me that he had an office position
4  open in Dothan.  I told him that the
5  onliest type -- rephrase that.  I told him
6  that I had never done any office work, so I
7  could not say if that was something that I
8  could do and that Panama City would be too
9  far for me to have to travel to run a route
10  sales truck.  He then said that maybe he
11  could get a van and let me make some -- let
12  me add some new accounts and until I
13  established a route that I could run on my
14  own.
15      Q.  Did you talk about money?
16      A.  No, sir, we did not.
17      Q.  Do you have copies of any job
18  applications that you have submitted, like
19  the one with Buffalo Rock?  Do you have a
20  copy of that?
21      A.  No, sir, I don't.
22      Q.  My client's actual name is
23  Trumbull Bottled Water, Inc., and they also

Page 59

1  go -- in Dothan, at least, they go by
2  Culligan of the Wiregrass.
3      A.  Okay.
4      Q.  And if it is all the same to you,
5  I guess we can refer to them as Culligan or
6  Trumbull or whatever you want.  But if I
7  say Culligan or if I say Trumbull, I'm
8  going to -- unless I say otherwise, that's
9  what I'm talking about.  I'm talking about
10  my client.
11      A.  Yes, sir.
12      Q.  Do you know anybody who works at
13  the Dothan branch?
14      A.  No, sir, I don't.
15      Q.  Have you ever known anybody who
16  works at that Culligan's Dothan branch?
17      A.  No, sir.
18      Q.  Do you know anybody -- I know you
19  have spoken to Jay Trumbull on the phone?
20      A.  Yes, sir.
21      Q.  Do you know anybody who works at
22  the Panama City facility?
23      A.  No, sir, I don't.

Page 60

1      Q.  Have you ever known anyone?
2      A.  No, sir.
3      Q.  Have you ever known anyone who
4  applied for a job at either of those
5  facilities?
6      A.  No, sir.
7      Q.  Have you ever known of anyone who
8  applied for a job at either of those
9  facilities?
10      A.  Myself.
11      Q.  Right.  Other than yourself?
12      A.  No, sir.
13      Q.  When was the first time that you
14  heard anything about Culligan and the
15  Wiregrass?
16      A.  You know, when you live in the
17  Wiregrass you do know about Culligan.
18      Q.  You do?
19      A.  Because, I mean, it is advertised
20  on our radios and everything.  So I have
21  known of Culligan water, you know, I guess
22  ever since I have been there.
23      Q.  Did you know where the facility

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 61

1  was located?
2      A.  No, sir.  I had the address in the
3  Dothan Eagle.
4      Q.  This is where you saw the
5  newspaper ad in January of last year?
6      A.  Yes, sir.
7      Q.  You had never noticed it driving
8  by?
9      A.  Well, I had, sir, but it -- you
10 know that day, you know, you start to think
11 where have I seen that ad?  Where have I
12 seen that ad?  So that's how that was.
13     Q.  So you saw a newspaper
14 advertisement for Culligan of the
15 Wiregrass?
16     A.  Yes, sir.
17     Q.  That was in January of '05?
18     A.  Yes, sir.
19     Q.  Did the ad say what the job was
20 about?
21     A.  Route sales.
22     Q.  Did it say what was required in
23 that job?

Page 62

1      A.  Not that I can remember, sir.
2      Q.  All right.  So you see the ad in
3  the paper and what did you do next?
4      A.  The next day I went and applied
5  for the job.
6      Q.  You went down to the actual
7  facility?
8      A.  Yes, sir.
9      Q.  Did you call anybody before then?
10     A.  No, sir.
11     Q.  So you just drove down there.  How
12 close is your home to -- to the Culligan of
13 the Wiregrass?
14     A.  Probably about four miles.
15     Q.  So that just took you about three
16 and a half hours to get there?
17     A.  No, sir.
18     Q.  Did you go down there in the
19 morning or midday or afternoon, do you
20 recall?
21     A.  It was mid morning and the reason
22 for that was my son had called me and he
23 was sick at school and so I had to go pick

Page 63

1  him up first and then I went to Culligan.
2      Q.  Did you take your son with you?
3      A.  Yes, sir, I did.
4      Q.  And Michelle Potter was also with
5  you?
6      A.  Yes, sir.
7      Q.  Why was she with you?
8      A.  I don't know what had come up that
9  day, but she was in Dothan and she had
10 called me and actually wanted to go out to
11 breakfast.  We often did at Shoney's.  And
12 I told her I couldn't because I had to go
13 and apply for a job and she just rode with
14 me.  And in the midst of doing that,
15 stopping and getting gas, we had to stop
16 and get gas, and then my son called, mom,
17 I'm sick, come get me.  And so we went and
18 picked him up and then I went on to do what
19 I was doing.
20     Q.  So you pulled up.  Is there, like,
21 a parking lot out front, parking area?
22     A.  Yes, sir.  When you pull up --
23 when you -- when you pull up, you can go to

Page 64

1  the right and there is, like, just a few
2  little spaces right here or you can go
3  straight on up, which would be where, you
4  know, the majority of the trucks come in
5  and pull up and stuff.  There is a few
6  parking spots on that side as well.  But as
7  I pulled up, I pulled in to the right where
8  just a few spaces are.
9      Q.  So that's the front of the
10 building?
11     A.  Yes, sir, right by the front door.
12     Q.  Did you go in the front door?
13     A.  Yes, sir, I did.
14     Q.  Describe what you saw?
15     A.  When I walked in, I didn't see
16 anyone to start with.  But when I walked in
17 to your immediate left is a big long, like,
18 counter.
19     Q.  Okay.
20     A.  And so then I approached that
21 counter.
22     Q.  How big is the room that you are
23 standing in?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 65

1    A.  I'm no good with measurements at
2  all, but I can tell you that when you walk
3  in the door you immediately have got this
4  long counter to your -- to my left.  Okay.
5  On your right, you have got, like, a little
6  -- a little office, like a little foyer
7  type thing.  And then behind that desk you
8  have got another area of, like, a desk and
9  typewriters and phones and stuff of that
10  nature.  And then where the two gentlemen
11  were sitting was in the office located
12  right behind the area I just described.
13    Q.  To the left or to the right?
14    A.  To the left.
15    Q.  Okay.  So there is counter to the
16  left?
17    A.  Counter, work space (indicating).
18    Q.  Work space behind it?
19    A.  Secretary space.  Behind that is a
20  window and a door.
21    Q.  Okay.  And that's where you saw --
22    A.  The two gentlemen.
23    Q.  Were they the only ones that you

Page 66

1  saw?
2    A.  Yes, sir.
3    Q.  Okay.  The counter, is this like a
4  service counter?
5    A.  Yes, sir.
6    Q.  So I take it you went up there.
7  What did you do, ring a bell, knock on the
8  counter, what did you do?
9    A.  No, sir, they seen me.  Once I
10  approached the counter, they seen me and
11  one of the gentlemen came out to help me
12  and so I told him what I was there for.
13    Q.  Okay.  Did you see anything on the
14  counter?
15    A.  There was numerous things on the
16  counter.
17    Q.  Papers?
18    A.  There was papers.  There was,
19  like, a folder type thing.  But that's all
20  that I recall.
21    Q.  Did you see a stack of job
22  applications on the counter?
23    A.  Yes, I do believe there was some

Page 67

1  applications there.
2    Q.  Somebody comes out -- a man comes
3  out from behind the door?
4    A.  Yes, sir.
5    Q.  Comes out to greet you?
6    A.  Yes, sir.
7    Q.  What did this man look like?
8    A.  He was -- he was short -- kind of
9  short natured.  Kind of chunky.  As far as
10  facial expressions, I can't remember
11  exactly.  I mean, I would recognize him if
12  I seen him, but to describe it to you
13  exactly what he looked like, I believe he
14  had a mustache.  But I can't, you know --
15    Q.  Did he have a name tag on?
16    A.  I don't remember.
17    Q.  Uniform?
18    A.  I don't remember what he was
19  wearing, sir.
20    Q.  Do you remember his hair color?
21    A.  Dark in nature.
22    Q.  Okay.  Full head of hair or
23  handsome like me?

Page 68

1    A.  Handsome like you.  I don't think
2  he had a whole lot of hair.
3    Q.  Thank you.  Did he identify
4  himself, do you recall?  Did he say who he
5  was?
6    A.  I don't recall.
7    Q.  Black or white?
8    A.  White.
9    Q.  Since this EEOC charge was
10  initiated and the lawsuit was filed, you
11  have heard the name Pete Rollins?
12    A.  Yes.
13    Q.  Do you recall whether that was the
14  person you spoke to?  Does that name ring a
15  bell or do you just know that from seeing
16  it in this case?
17    A.  No, that name rung a bell.
18    Q.  Can you be certain that you spoke
19  to somebody named Pete or does that seem to
20  make -- that just rings a bell?
21    A.  No, sir, it doesn't just ring a
22  bell.  As I walked in that day and I
23  approached the counter and he come walking

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 69

1  up towards me, there was a gentleman that
2  was sitting in the back of that little
3  office that leaned back in his chair like
4  this and that's when -- I never knew his
5  name. I couldn't remember his name. And
6  that's when -- when I told them what I was
7  there for, Pete will help you. But that's
8  all I knew.
9     Q. Oh.
10    A. That's all I knew.
11    Q. Okay. I got you. So the first
12 guy that came out said Pete will help you.
13    A. No, sir. No, sir. No, sir. The
14 guy leaned back in the chair. The
15 gentleman that stayed in the office, leaned
16 back in the chair with the door open like
17 this.
18    Q. Like with his back to you?
19    A. No, he was like to the side, just
20 like this right here (indicating). Leaned
21 back, turned his head this way, and Pete
22 was walking towards me.
23    Q. Okay. And so the guy was just

Page 70

1  talking to you. Pete was walking towards
2  you. You said exactly what? Do you
3  remember what you said? You said you told
4  him why you were there, but do you remember
5  what you said?
6     A. Yeah, that I was there to apply
7  for the job.
8     Q. Do you remember the exact words
9  that you used?
10    A. That I was there to apply for the
11 job. You know, and then he started talking
12 and I wanted to know about the job.
13    Q. Don't get ahead of us.
14    A. Okay.
15    Q. Did you say this to Pete or did
16 you say it to the guy in the chair?
17    A. Pete. The one that came out to
18 greet me.
19    Q. When did the guy in the chair say
20 Pete will help you?
21    A. As Pete were walking out the door,
22 they were back there giggling and cutting
23 up. He leans back in his chair and that's

Page 71

1  when he acknowledges me coming in and then
2  Pete comes walking up to the counter.
3     Q. Is that when you said I'm here to
4  apply for a job or had you said that before
5  Pete came out?
6     A. No, sir. When Pete was
7  approaching this -- the counter top.
8     Q. Okay. And when we say Pete, we're
9  referring to the shortish man with the dark
10 hair, with some dark hair?
11    A. Yes.
12    Q. Where was your son? Where was
13 Michelle Potter?
14    A. In the car.
15    Q. Did they ever come inside?
16    A. No, sir.
17    Q. Okay. The man we'll call Pete
18 comes to the counter and the two of you
19 have a discussion; right?
20    A. Uh-huh. Yes, sir, I'm sorry.
21    Q. How long were you in there talking
22 to Pete?
23    A. Several minutes. I can't be

Page 72

1  precise on the minutes, but he and I were
2  in a conversation.
3     Q. Like maybe five minutes?
4     A. Yes, sir.
5     Q. Okay.
6     A. Approximately, yes, sir.
7     Q. Probably not ten?
8     A. I'm not sure of quite how many
9  minutes. I know I was in there for several
10 minutes.
11    Q. As best you can --
12    A. Okay.
13    Q. -- tell me everything that was
14 said --
15    A. Okay.
16    Q. -- starting at the beginning.
17    A. Okay. When he come out and I told
18 him what I was there for, then he and I got
19 into a conversation. And he was explaining
20 to me what the job was in detail of, what
21 you had to do. One of the things being you
22 have to lift and he turned or he did his
23 hand out like this, and said you have to

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 73

1  lift the bottles of water. Yes, sir, I can
2  do that. Oh, and also you see those bags
3  sitting right there by the door? Yes, sir.
4  You have to lift those bags as well. Yes,
5  sir. Okay.
6     Q.  We're going to spend a little bit
7  of time on this conversation obviously. So
8  I'm going to be interrupting you and I
9  apologize for doing that because I have
10  asked you to tell me everything that was
11  said. You are going to get your chance,
12  but I do want to stop while we're thinking
13  about it. Tell me about the bags.
14     A.  The only thing that I know about
15  the bags is that they are brown in color
16  and that -- I don't know if he said that it
17  was sugar, salt, some sort of powder or
18  something, but he had told me what was in
19  the bags.
20     Q.  Okay.
21     A.  I just don't remember what that
22  contents was. But he pointed to the -- to
23  a bag. And he pointed to the jugs of

Page 74

1  water.
2     Q.  What did you say -- you said I can
3  lift those bottles?
4     A.  Yes, I said I can do that. I have
5  had experience in that.
6     Q.  What about the bags?
7     A.  Yes, sir, I can lift those.
8     Q.  Did he tell you how much they
9  weighed?
10     A.  He did tell me how much they
11  weighed. I don't remember the exact amount
12  that he told me at that -- today I don't
13  remember the exact amount. But he said --
14  but the whole general conversation
15  consisted of fifty pounds. And he asked me
16  was I going to be able to lift that.
17     Q.  I think you just answered the
18  question I was going to ask. You said the
19  whole general conversation about
20  fifty pounds. He was basically just
21  telling you about how much you were going
22  to have to lift?
23     A.  Yes, sir.

Page 75

1     Q.  Here's the bottles, here is some
2  bags, can you lift fifty pounds?
3     A.  Yes, sir.
4     Q.  That sort of thing?
5     A.  Well, that was going to be -- that
6  was going to be the weight. He already
7  assumed that I wasn't going to be able to
8  lift the fifty pounds. I was trying to
9  tell him that I had experience.
10     Q.  Tell me what you mean by he
11  already assumed that you weren't going to
12  be able to?
13     A.  Because, you know, just like --
14  you know, you can feel people. And just
15  like -- I mean, when I was speaking with
16  him, it was, like, you know, I really
17  wanted this job. I love route sales, but
18  by the way that he was approaching me and
19  talking to me, you know, I knew that I
20  wasn't going to get the job and then when
21  he come right out and said we can't hire a
22  woman for this position. I know I
23  shouldn't be saying that and laughing about

Page 76

1  that. My feelings was hurt.
2     Q.  Sorry to interrupt. Let's back up
3  a little bit.
4     A.  Okay.
5     Q.  Just to be clear, when you say he
6  already assumed I can not lift fifty
7  pounds --
8     A.  Yes, sir.
9     Q.  -- was that based on your own
10  assumption?
11     A.  He never did look at me and tell
12  me you can't lift fifty pounds. He did
13  look at me and tell me we cannot hire a
14  woman for this position. We just can't do
15  it.
16     Q.  He didn't say I know you can't
17  lift fifty pounds or he didn't say anything
18  like that?
19     A.  He never once said, ma'am, I know
20  you cannot lift fifty pounds.
21     Q.  Did he say I don't think you can
22  lift fifty pounds?
23     A.  He suggested it. He never did

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 77

1 look at me and say you cannot lift
2 fifty pounds.
3    Q. Exactly what did he say when he
4 suggested it?
5    A. He was, ma'am, we can't hire a
6 woman for this position. You know, it is
7 just we -- we -- we just can't put a woman
8 lifting that kind of stuff up and down off
9 of these trucks all day. I said --
10    Q. Go ahead.
11    A. I said, I do have experience in
12 this. I have pulled product from Swan's
13 trucks climbing up on the ladders of the
14 side of the truck, reaching up, pulling
15 products off of the truck. I can do this.
16 Ma'am, we just -- we just -- and he
17 actually thought it was funny. He laughed
18 about it.
19    Q. I want to just make sure that we
20 have down as best you can the exact words
21 that he used and I know you have been
22 through this and I want to make sure --
23 already you have told me a lot of this.

Page 78

1 But I want to make sure that we're getting
2 the exact words as opposed to your
3 approximation of the words.
4    A. Okay.
5    Q. Okay. And I want you to start at
6 the point where he is telling you about the
7 job.
8    A. Okay.
9    Q. Which I assume this happened
10 before he said -- ma'am, we can't hire a
11 woman?
12    MR. WILSON: I'm going to object
13 as asked and answered. Go ahead again.
14    Q. I want you to take it in order.
15 So start with the first discussion, the
16 first point of the discussion that you and
17 the man we're calling Pete had about this
18 position that you are coming in for?
19    A. Okay. The onlyiest way I know how
20 to answer what you are asking me is just to
21 kind of sit here and say exactly -- okay, I
22 walk in. He comes out. Hey, hi, my name
23 is Lisa Minton, how are you? Fine. How

Page 79

1 are you? Well, I'm here to apply for your
2 job. I had seen it in the newspaper and I
3 would like to apply for the job. Do you
4 have any experience? Yes, sir, I do.
5    Q. Okay. Let's go slow then. Does
6 he literally say, do you have any
7 experience?
8    A. Yes.
9    Q. So you are not just approximating
10 what probably happened in the conversation
11 because that's the way these conversations
12 go --
13    A. Okay.
14    Q. -- are you? I mean, are you just
15 saying it was this kind of a conversation
16 and went like this or are you giving me
17 exact words?
18    A. I was displaying for you exactly
19 what I said and what he said to me as I
20 come into the door and approached the
21 counter and he approached the counter with
22 me.
23    Q. All right.

Page 80

1    A. So I introduced myself.
2    Q. Okay.
3    A. And I tell him what I'm there for.
4    Q. And he asked do you have any
5 experience?
6    A. Yes, sir. And I was in the midst
7 of telling him what experience I have.
8    Q. Which was?
9    A. Which was Schwan's and which was
10 Made-Right.
11    Q. Okay.
12    A. Which he -- at that point, he
13 never did let me finish that whole
14 conversation. He never did let me even
15 finish explaining to him what my
16 qualifications was. Okay?
17    Q. What did he do?
18    A. That's when he interrupted me and
19 started telling me about what they do, what
20 their route sales people do. Okay? And
21 that was when the bottle of water, you
22 know, this is what -- this is the bottle of
23 water here and there was one sitting in the

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 81

1  little lobby area that I explained to you.
2  And there was a bag in the lobby area. I
3  don't know the contents of the bag. He did
4  tell me, but I don't remember what the
5  contents was. I said, well, that would be
6  fine. I can do this.
7      Q. Okay.
8      A. Well, the conversation kind of
9  went from at that point --
10     Q. Hold on now. Again, this is for
11 clarity.
12     A. Okay.
13     Q. Don't characterize it right now.
14 Where the conversation went that sort of
15 thing.
16     A. Okay.
17     Q. I want you to tell me the actual
18 words. You know what I'm saying? Don't
19 describe the general subjects of what is
20 happening and what you are thinking and all
21 of that sort of stuff. We are going to get
22 to that. But I want you to tell me the
23 actual words that are being used by Pete

Page 82

1  and by yourself during this conversation.
2  So he told you about the bottles and he
3  told you about the bags and he talked about
4  having to lift fifty pounds?
5      A. Yes, sir.
6      Q. And you are saying I can handle
7  it.
8      A. I can do this.
9      Q. Okay.
10     A. Yes, sir.
11     Q. Continue.
12     A. Okay. That's when he -- okay? So
13 I'm telling him that I can do this. You
14 know, I have experience in this and I can
15 do this.
16     Q. What is the next thing that you
17 remember saying?
18     A. And he is saying to me -- because
19 I was pushing myself really.
20     Q. Okay.
21     A. And what he said to me was, ma'am,
22 we can't hire a woman for this position.
23 We just can't have a woman climbing up and

Page 83

1  down, lifting these bottles of water and
2  these bags all day.
3      Q. Now, those words you just --
4      A. Yes, sir.
5      Q. -- recited, those were the exact
6  words that he used?
7      A. Yes, sir. (Witness nods head.)
8      Q. And you are a hundred percent
9  positive about that?
10     A. Yes, sir. Yes, sir.
11     Q. And he said that while you were
12 trying to say I can handle it?
13     A. Yes, sir.
14     Q. And you said that he was laughing?
15     A. He laughed, yes, sir. He did.
16 His comment was, I know I shouldn't be
17 saying this and laughed. I know I
18 shouldn't be saying this. At that point
19 the conversation kind of dwindled away.
20 Thank you, sir, have a good day. I walked
21 out the door. I was so upset. There was
22 something on the door. I don't know what
23 it was. But as I opened the door and

Page 84

1  walked out, it cut my finger. And I went
2  and got in the car and I just sat there.
3  Michelle says what's wrong with you? I
4  said you would not believe what just took
5  place and I commenced into telling her.
6      Q. Did he tell you that you were not
7  permitted to fill out an application?
8      A. He would not -- he wouldn't let me
9  fill out on application.
10     Q. What do you mean?
11     A. He wouldn't give me the
12 opportunity to fill out an application.
13     Q. What do you mean?
14     A. Because he was telling me -- I
15 mean, he was telling me I can't -- we can't
16 hire a woman for this position. And I was
17 steady trying to prove to him that I could
18 do this. Just give me a chance. Just,
19 please, give me a chance, I can do this.
20 He wouldn't give me the opportunity -- he
21 wouldn't let me have the opportunity to
22 fill out an application.
23     Q. There are applications right there

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 85

1  next to you?
2      A. Yes, sir. Now, I'm assuming
3  that's what that was. I seen -- yes, you
4  know, that looked like applications on that
5  counter right there. Did I ever pick one
6  up and look at it? No, sir, I did not.
7      Q. Did he tell you, ma'am, I will not
8  permit you to fill out an application?
9      A. No, sir. He did not look at me
10 and say I'm not going to allow you to fill
11 out on application, ma'am. He said to me,
12 I cannot hire you. I cannot hire a woman
13 for this position. I just can't do it and
14 he laughed.
15     Q. Did you say, well, how about if I
16 fill out an application anyway?
17     A. At one point in time I did say
18 something to him about an application. He
19 shunned -- he -- I had said something to
20 him about filling out an application and
21 that's when he shunned me off. When he --
22 when he -- you know, like led -- like, I'm
23 speak to you. And I'm asking you a direct

Page 86

1  question. But you don't want to have to
2  answer that direct question, so you lead
3  into something else. That's what he did to
4  me.
5      Q. Better give me the words.
6      A. I can't -- I can't -- he did not
7  look at me and say, ma'am, you cannot fill
8  out an application.
9      Q. Did you say can I fill out an
10 application?
11     A. I had asked him could I fill out
12 an application.
13     Q. He did not say, no, you cannot?
14     A. He never did look at me and say,
15 ma'am, you cannot. He told me when I asked
16 that question, he told me and laughed,
17 ma'am, we cannot hire a woman for this
18 position.
19     Q. And then you left?
20     A. Yes, sir.
21     Q. Did Pete give you the impression
22 it was up to him as to who would be hiring
23 for that position?

Page 87

1      MR. WILSON: Object to form.
2      A. Yes he did.
3      Q. Did he say -- what did he say that
4  led you to believe that?
5      A. When I had went in there and the
6  gentleman had leaned back, he was the one
7  that -- he was the one that let me know
8  that Pete was the person in charge and that
9  Pete would help -- that he would be helping
10 me, Pete would be helping me. And as that
11 point happened, Pete walked straight up to
12 the counter.
13     Q. Okay. So you assumed that if Pete
14 was the one that was supposed to help you,
15 it would be his decision as to who would be
16 hired?
17     A. Well, from the way he come across
18 he was the decision. He is the one that
19 told me, ma'am, I just cannot hire a woman
20 for this position. That is -- that's what
21 he told me. I cannot hire a woman for this
22 position. I just can't do it. And laughed
23 and said, I know I shouldn't be saying

Page 88

1  this.
2      Q. What did the other man look like
3  sitting in the chair?
4      A. He was skinnier and taller, but
5  other than that I don't know.
6      Q. Was he in uniform?
7      A. I believe he was. Well, you know,
8  I believe that there was a name tag, a
9  patch on his shirt, but I didn't look that
10 close -- that close.
11     Q. Okay.
12     A. But he was a more taller, lanky,
13 skinnier dude.
14     Q. Did you say to Pete after he
15 described the position to you that -- that
16 didn't sound like a job for you?
17     A. No, sir, I didn't.
18     Q. Is it possible, Ms. Minton, that
19 he said I have never hired a woman for this
20 position?
21     A. No, sir.
22     MR. WILSON: Object to the form.
23     THE WITNESS: No, sir, that's not

22 (Pages 85 to 88)

# FREEDOM COURT REPORTING

Page 89

1  what he said, sir. No, it is not.
2      Q. Is it possible that he said no
3  woman has ever applied for this position
4  before?
5      A. No, sir. No, sir.
6          MR. WILSON: Object to the form.
7          THE WITNESS: No, sir, he didn't
8  say that at all.
9      Q. So you are a hundred percent
10 certain that he said I cannot hire a woman
11 for this position?
12         MR. WILSON: Object to form, asked
13 and answered.
14     A. That's exactly what he said. I
15 cannot hire a woman for this position. I
16 just can't do it and laughed and then said
17 I know I shouldn't be saying this.
18     Q. Have you ever talked to anybody
19 else at Culligan about that or about the
20 job?
21     A. To Mr. Jay.
22     Q. I meant before you filed the EEOC
23 charge. I know you talked to Jay Trumbull

Page 90

1  recently.
2      A. No, sir.
3      Q. You didn't call anybody to lodge a
4  complaint with the company itself?
5      A. No, sir.
6      Q. So what was the next thing you
7  did?
8      A. That afternoon Michelle and myself
9  and Mason, we rode around and did a few
10 errands. Picked up something for supper
11 that night, and Michelle spent a few hours
12 at the house and her and I were talking and
13 I believe the next day, I called -- I
14 called an attorney.
15     Q. Would you look at Defendant's
16 Exhibit 3, whichever one it is, the EEOC
17 charge?
18     A. This one, okay.
19     Q. The information in paragraphs one
20 through six, that is information that you
21 provided; is that right?
22         MR. WILSON: Object. Asked and
23 answered.

Page 91

1      A. Yes, sir.
2      Q. Paragraph five says, I'm going to
3  read it and tell me if I mess up: Upon
4  information and belief Culligan has a
5  discriminatory policy of not hiring females
6  for available jobs. Moreover, the
7  respondent engages in a pattern and
8  practice of discriminating against female
9  job applicants on a class wide basis in
10 hiring. And you have declared under
11 penalty of perjury that the foregoing is
12 true and correct?
13     A. Yes, sir.
14         MR. WILSON: Object to that last
15 question. I'm sorry.
16     Q. What information do you have that
17 says Culligan has a discriminatory policy
18 of not hiring females for available jobs?
19         MR. WILSON: Object to the form.
20     A. When I went in there that day
21 there wasn't one female. When I rode
22 around town, you never seen one female. On
23 all of their vehicles, everything you see

Page 92

1  is the Culligan man, the Cullman man. I
2  rode around town and every time I would see
3  a truck, I would look to see if there was a
4  female. You never saw not one female.
5      Q. Because you never saw a female
6  driving a Culligan truck --
7      A. I never saw a female, period.
8      Q. Are you telling me there are no
9  females that work for Culligan?
10         MR. WILSON: Object to the form.
11     A. Not to my knowledge.
12     Q. The second statement: Moreover,
13 the respondent engages in a pattern and
14 practice of discriminating against job
15 applicants on a class wide basis in hiring.
16 What females have applied for jobs with my
17 client?
18         MR. WILSON: Object to the form.
19     A. Could you ask that one more time,
20 please?
21     Q. What females other than yourself
22 in filling out your application recently --
23     A. Yes, sir.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 93

1   Q.  -- have applied for a job with my
2   client?
3        MR. WILSON: Object to the form.
4   A.  I don't know of my females. I
5   just know that there is no females.
6   Q.  Well, there are. I will tell you
7   that. I will represent to you there are
8   females working for Culligan. That is not
9   the issue here. I'm asking you what
10  females do you know of that applied for any
11  position at all with my client and you said
12  you don't know of any; correct?
13  A.  Correct.
14  Q.  So why would you tell the EEOC
15  that you have information that Culligan
16  engages in a pattern and practice of
17  discriminating against female job
18  applicants on a class wide basis in hiring?
19       MR. WILSON: Object to the form.
20  A.  I have not seen any females. I
21  have not seen not one female that works for
22  Culligan.
23  Q.  You have no idea who has applied

Page 94

1   for jobs the gender, the people, no idea;
2   correct?
3        MR. WILSON: Object to the form.
4   A.  Correct.
5   Q.  So when you say you have
6   information that they have a pattern and
7   practice of discriminating against female
8   job applicants, that's not true, is it?
9        MR. WILSON: Object. She says
10  upon information and belief.
11  Q.  Uh-huh. Upon information --
12  A.  My belief.
13  Q.  Information and belief; right?
14  A.  Yes, sir, but to my belief, there
15  is no females to my knowledge with Culligan
16  Water.
17  Q.  Did you talk to anybody at the
18  EEOC about this charge? Did you personally
19  speak to them?
20  A.  No, I did not.
21  Q.  So you never explained that you
22  don't actually have any information about
23  discrimination against female job

Page 95

1   applicants?
2        MR. WILSON: Object to the form.
3   A.  Rephrase that one more time.
4   Q.  Well, you say in paragraph five
5   upon information and belief the respondent
6   engages in a pattern and practice of
7   discriminating against female job
8   applicants.
9   A.  But that is my belief, sir. I do
10  believe.
11  Q.  What information? I'm asking you
12  what information?
13       MR. WILSON: Objection. She has
14  testified to the information she has. That
15  has been answered. She has testified about
16  --
17  Q.  Because you never saw anybody in
18  the truck. That convinced you that
19  Culligan -- that was the information that
20  Culligan discriminated against female job
21  applicants?
22  A.  Sir, I have never seen any
23  females, period. So therefore, when he

Page 96

1   looked at me and told me I cannot hire
2   you -- I cannot hire a woman for this
3   position, and then when you look around and
4   you look and you look and you look and you
5   never see any women, and you have been told
6   this, that is my belief.
7   Q.  Okay. Why don't we take just a
8   very short break and we can go off the
9   record for just a second.
10
11       (Off-the-record discussion?)
12
13  Q.  I have no further questions.
14  Thank you for your time.
15  A.  Thank you.
16       MR. WILSON: I don't have
17  anything.
18
19
20
21
22
23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 97

```
1        CERTIFICATE
2
3   STATE OF ALABAMA
4   JEFFERSON COUNTY
5
6        I hereby certify that the above
7   and foregoing deposition was taken down by
8   me in stenotype, and the questions and
9   answers thereto were reduced to typewriting
10  under my supervision, and that the
11  foregoing represents a true and correct
12  transcript of the deposition given by said
13  witness upon said hearing.
14       I further certify that I am
15  neither of counsel nor of kin to the
16  parties to the action, nor am I in anywise
17  interested in the result of said cause.
18
19
20
21       Donna Armstrong
22
23
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**