# FREEDOM COURT REPORTING

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION
CIVIL ACTION NO. 1:05-CV-877-CSC

LISA MINTON,
    Plaintiff,
vs.
CULLIGAN WATER, INC.,
    Defendants.

DEPOSITION OF LISA MINTON
In accordance with Rule 5(d) of The Alabama Rules of Civil Procedure, as Amended, effective May 15, 1988, I, DONNA ARMSTRONG, am hereby delivering to KEITH HAMILTON the original transcript of the oral testimony taken on the 24th day of March, 2006, along with exhibits.
Please be advised that this is the same and not retained by the Court Reporter, nor filed with the Court.

**Page 2**

DEPOSITION TESTIMONY OF:
    LISA MINTON
    MARCH 24, 2006
    1:25 p.m.

COURT REPORTER: Donna Armstrong

STIPULATION

IT IS STIPULATED AND AGREED, by and between the parties, through their respective counsel, that the deposition of LISA MINTON may be taken before Donna Armstrong, Commissioner, Certified Professional Reporter and Notary Public, State at Large;

IT IS FURTHER STIPULATED AND AGREED that the signature to and reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions;

**Page 3**

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of trial, or at the time said deposition is offered in evidence, or prior thereto.

IT IS FURTHER STIPULATED AND AGREED that the notice of filing of the deposition by the Commissioner is waived.

**Page 4**

I N D E X

EXAMINATION BY:                PAGE:
MR. HAMILTON                   06

E X H I B I T S

Defendant's 1                  29
Defendant's 2                  31
Defendant's 3                  34
Defendant's 4                  37
Defendant's 5                  48

1 (Pages 1 to 4)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

FREEDOM COURT REPORTING

Page 61

1  was located?
2      A.  No, sir. I had the address in the
3  Dothan Eagle.
4      Q.  This is where you saw the
5  newspaper ad in January of last year?
6      A.  Yes, sir.
7      Q.  You had never noticed it driving
8  by?
9      A.  Well, I had, sir, but it — you
10 know that day, you know, you start to think
11 where have I seen that ad? Where have I
12 seen that ad? So that's how that was.
13     Q.  So you saw a newspaper
14 advertisement for Culligan of the
15 Wiregrass?
16     A.  Yes, sir.
17     Q.  That was in January of '05?
18     A.  Yes, sir.
19     Q.  Did the ad say what the job was
20 about?
21     A.  Route sales.
22     Q.  Did it say what was required in
23 that job?

Page 62

1      A.  Not that I can remember, sir.
2      Q.  All right. So you see the ad in
3  the paper and what did you do next?
4      A.  The next day I went and applied
5  for the job.
6      Q.  You went down to the actual
7  facility?
8      A.  Yes, sir.
9      Q.  Did you call anybody before then?
10     A.  No, sir.
11     Q.  So you just drove down there. How
12 close is your home to -- to the Culligan of
13 the Wiregrass?
14     A.  Probably about four miles.
15     Q.  So that just took you about three
16 and a half hours to get there?
17     A.  No, sir.
18     Q.  Did you go down there in the
19 morning or midday or afternoon, do you
20 recall?
21     A.  It was mid morning and the reason
22 for that was my son had called me and he
23 was sick at school and so I had to go pick

Page 63

1  him up first and then I went to Culligan.
2      Q.  Did you take your son with you?
3      A.  Yes, sir, I did.
4      Q.  And Michelle Potter was also with
5  you?
6      A.  Yes, sir.
7      Q.  Why was she with you?
8      A.  I don't know what had come up that
9  day, but she was in Dothan and she had
10 called me and actually wanted to go out to
11 breakfast. We often did at Shoney's. And
12 I told her I couldn't because I had to go
13 and apply for a job and she just rode with
14 me. And in the midst of doing that,
15 stopping and getting gas, we had to stop
16 and get gas, and then my son called, mom,
17 I'm sick, come get me. And so we went and
18 picked him up and then I went on to do what
19 I was doing.
20     Q.  So you pulled up. Is there, like,
21 a parking lot out front, parking area?
22     A.  Yes, sir. When you pull up —
23 when you — when you pull up, you can go to

Page 64

1  the right and there is, like, just a few
2  little spaces right here or you can go
3  straight on up, which would be where, you
4  know, the majority of the trucks come in
5  and pull up and stuff. There is a few
6  parking spots on that side as well. But as
7  I pulled up, I pulled in to the right where
8  just a few spaces are.
9      Q.  So that's the front of the
10 building?
11     A.  Yes, sir, right by the front door.
12     Q.  Did you go in the front door?
13     A.  Yes, sir, I did.
14     Q.  Describe what you saw?
15     A.  When I walked in, I didn't see
16 anyone to start with. But when I walked in
17 to your immediate left is a big long, like,
18 counter.
19     Q.  Okay.
20     A.  And so then I approached that
21 counter.
22     Q.  How big is the room that you are
23 standing in?

16 (Pages 61 to 64)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 65

1  A. I'm no good with measurements at
2  all, but I can tell you that when you walk
3  in the door you immediately have got this
4  long counter to your -- to my left. Okay.
5  On your right, you have got, like, a little
6  -- a little office, like a little foyer
7  type thing. And then behind that desk you
8  have got another area of, like, a desk and
9  typewriters and phones and stuff of that
10 nature. And then where the two gentlemen
11 were sitting was in the office located
12 right behind the area I just described.
13    Q. To the left or to the right?
14    A. To the left.
15    Q. Okay. So there is counter to the
16 left?
17    A. Counter, work space (indicating).
18    Q. Work space behind it?
19    A. Secretary space. Behind that is a
20 window and a door.
21    Q. Okay. And that's where you saw --
22    A. The two gentlemen.
23    Q. Were they the only ones that you

Page 66

1  saw?
2     A. Yes, sir.
3     Q. Okay. The counter, is this like a
4  service counter?
5     A. Yes, sir.
6     Q. So I take it you went up there.
7  What did you do, ring a bell, knock on the
8  counter, what did you do?
9     A. No, sir, they seen me. Once I
10 approached the counter, they seen me and
11 one of the gentlemen came out to help me
12 and so I told him what I was there for.
13    Q. Okay. Did you see anything on the
14 counter?
15    A. There was numerous things on the
16 counter.
17    Q. Papers?
18    A. There was papers. There was,
19 like, a folder type thing. But that's all
20 that I recall.
21    Q. Did you see a stack of job
22 applications on the counter?
23    A. Yes, I do believe there was some

Page 67

1  applications there.
2     Q. Somebody comes out -- a man comes
3  out from behind the door?
4     A. Yes, sir.
5     Q. Comes out to greet you?
6     A. Yes, sir.
7     Q. What did this man look like?
8     A. He was -- he was short -- kind of
9  short natured. Kind of chunky. As far as
10 facial expressions, I can't remember
11 exactly. I mean, I would recognize him if
12 I seen him, but to describe it to you
13 exactly what he looked like, I believe he
14 had a mustache. But I can't, you know --
15    Q. Did he have a name tag on?
16    A. I don't remember.
17    Q. Uniform?
18    A. I don't remember what he was
19 wearing, sir.
20    Q. Do you remember his hair color?
21    A. Dark in nature.
22    Q. Okay. Full head of hair or
23 handsome like me?

Page 68

1     A. Handsome like you. I don't think
2  he had a whole lot of hair.
3     Q. Thank you. Did he identify
4  himself, do you recall? Did he say who he
5  was?
6     A. I don't recall.
7     Q. Black or white?
8     A. White.
9     Q. Since this EEOC charge was
10 initiated and the lawsuit was filed, you
11 have heard the name Pete Rollins?
12    A. Yes.
13    Q. Do you recall whether that was the
14 person you spoke to? Does that name ring a
15 bell or do you just know that from seeing
16 it in this case?
17    A. No, that name rung a bell.
18    Q. Can you be certain that you spoke
19 to somebody named Pete or does that seem to
20 make -- that just rings a bell?
21    A. No, sir, it doesn't just ring a
22 bell. As I walked in that day and I
23 approached the counter and he come walking

17 (Pages 65 to 68)

**FREEDOM COURT REPORTING**

Page 69

1    up towards me, there was a gentleman that
2    was sitting in the back of that little
3    office that leaned back in his chair like
4    this and that's when -- I never knew his
5    name. I couldn't remember his name. And
6    that's when -- when I told them what I was
7    there for, Pete will help you. But that's
8    all I knew.
9        Q. Oh.
10       A. That's all I knew.
11       Q. Okay. I got you. So the first
12   guy that came out said Pete will help you.
13       A. No, sir. No, sir. No, sir. The
14   guy leaned back in the chair. The
15   gentleman that stayed in the office, leaned
16   back in the chair with the door open like
17   this.
18       Q. Like with his back to you?
19       A. No, he was like to the side, just
20   like this right here (indicating). Leaned
21   back, turned his head this way, and Pete
22   was walking towards me.
23       Q. Okay. And so the guy was just

Page 70

1    talking to you. Pete was walking towards
2    you. You said exactly what? Do you
3    remember what you said? You said you told
4    him why you were there, but do you remember
5    what you said?
6        A. Yeah, that I was there to apply
7    for the job.
8        Q. Do you remember the exact words
9    that you used?
10       A. That I was there to apply for the
11   job. You know, and then he started talking
12   and I wanted to know about the job.
13       Q. Don't get ahead of us.
14       A. Okay.
15       Q. Did you say this to Pete or did
16   you say it to the guy in the chair?
17       A. Pete. The one that came out to
18   greet me.
19       Q. When did the guy in the chair say
20   Pete will help you?
21       A. As Pete were walking out the door,
22   they were back there giggling and cutting
23   up. He leans back in his chair and that's

Page 71

1    when he acknowledges me coming in and then
2    Pete comes walking up to the counter.
3        Q. Is that when you said I'm here to
4    apply for a job or had you said that before
5    Pete came out?
6        A. No, sir. When Pete was
7    approaching this -- the counter top.
8        Q. Okay. And when we say Pete, we're
9    referring to the shortish man with the dark
10   hair, with some dark hair?
11       A. Yes.
12       Q. Where was your son? Where was
13   Michelle Potter?
14       A. In the car.
15       Q. Did they ever come inside?
16       A. No, sir.
17       Q. Okay. The man we'll call Pete
18   comes to the counter and the two of you
19   have a discussion; right?
20       A. Uh-huh. Yes, sir, I'm sorry.
21       Q. How long were you in there talking
22   to Pete?
23       A. Several minutes. I can't be

Page 72

1    precise on the minutes, but he and I were
2    in a conversation.
3        Q. Like maybe five minutes?
4        A. Yes, sir.
5        Q. Okay.
6        A. Approximately, yes, sir.
7        Q. Probably not ten?
8        A. I'm not sure of quite how many
9    minutes. I know I was in there for several
10   minutes.
11       Q. As best you can --
12       A. Okay.
13       Q. -- tell me everything that was
14   said --
15       A. Okay.
16       Q. -- starting at the beginning.
17       A. Okay. When he come out and I told
18   him what I was there for, then he and I got
19   into a conversation. And he was explaining
20   to me what the job was in detail of, what
21   you had to do. One of the things being you
22   have to lift and he turned or he did his
23   hand out like this, and said you have to

18 (Pages 69 to 72)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 77

1  look at me and say you cannot lift
2  fifty pounds.
3      Q.  Exactly what did he say when he
4  suggested it?
5      A.  He was, ma'am, we can't hire a
6  woman for this position. You know, it is
7  just we -- we -- we just can't put a woman
8  lifting that kind of stuff up and down off
9  of these trucks all day. I said --
10     Q.  Go ahead.
11     A.  I said, I do have experience in
12 this. I have pulled product from Swan's
13 trucks climbing up on the ladders of the
14 side of the truck, reaching up, pulling
15 products off of the truck. I can do this.
16 Ma'am, we just -- we just -- and he
17 actually thought it was funny. He laughed
18 about it.
19     Q.  I want to just make sure that we
20 have down as best you can the exact words
21 that he used and I know you have been
22 through this and I want to make sure --
23 already you have told me a lot of this.

Page 78

1  But I want to make sure that we're getting
2  the exact words as opposed to your
3  approximation of the words.
4      A.  Okay.
5      Q.  Okay. And I want you to start at
6  the point where he is telling you about the
7  job.
8      A.  Okay.
9      Q.  Which I assume this happened
10 before he said -- ma'am, we can't hire a
11 woman?
12         MR. WILSON: I'm going to object
13 as asked and answered. Go ahead again.
14     Q.  I want you to take it in order.
15 So start with the first discussion, the
16 first point of the discussion that you and
17 the man we're calling Pete had about this
18 position that you are coming in for?
19     A.  Okay. The onlyiest way I know how
20 to answer what you are asking me is just to
21 kind of sit here and say exactly -- okay, I
22 walk in. He comes out. Hey, hi, my name
23 is Lisa Minton, how are you? Fine. How

Page 79

1  are you? Well, I'm here to apply for your
2  job. I had seen it in the newspaper and I
3  would like to apply for the job. Do you
4  have any experience? Yes, sir, I do.
5      Q.  Okay. Let's go slow then. Does
6  he literally say, do you have any
7  experience?
8      A.  Yes.
9      Q.  So you are not just approximating
10 what probably happened in the conversation
11 because that's the way these conversations
12 go --
13     A.  Okay.
14     Q.  -- are you? I mean, are you just
15 saying it was this kind of a conversation
16 and went like this or are you giving me
17 exact words?
18     A.  I was displaying for you exactly
19 what I said and what he said to me as I
20 come into the door and approached the
21 counter and he approached the counter with
22 me.
23     Q.  All right.

Page 80

1      A.  So I introduced myself.
2      Q.  Okay.
3      A.  And I tell him what I'm there for.
4      Q.  And he asked do you have any
5  experience?
6      A.  Yes, sir. And I was in the midst
7  of telling him what experience I have.
8      Q.  Which was?
9      A.  Which was Schwan's and which was
10 Made-Right.
11     Q.  Okay.
12     A.  Which he -- at that point, he
13 never did let me finish that whole
14 conversation. He never did let me even
15 finish explaining to him what my
16 qualifications was. Okay?
17     Q.  What did he do?
18     A.  That's when he interrupted me and
19 started telling me about what they do, what
20 their route sales people do. Okay? And
21 that was when the bottle of water, you
22 know, this is what -- this is the bottle of
23 water here and there was one sitting in the

20 (Pages 77 to 80)

Page 81

1  little lobby area that I explained to you.
2  And there was a bag in the lobby area. I
3  don't know the contents of the bag. He did
4  tell me, but I don't remember what the
5  contents was. I said, well, that would be
6  fine. I can do this.
7     Q. Okay.
8     A. Well, the conversation kind of
9  went from at that point --
10    Q. Hold on now. Again, this is for
11 clarity.
12    A. Okay.
13    Q. Don't characterize it right now.
14 Where the conversation went that sort of
15 thing.
16    A. Okay.
17    Q. I want you to tell me the actual
18 words. You know what I'm saying? Don't
19 describe the general subjects of what is
20 happening and what you are thinking and all
21 of that sort of stuff. We are going to get
22 to that. But I want you to tell me the
23 actual words that are being used by Pete

Page 82

1  and by yourself during this conversation.
2  So he told you about the bottles and he
3  told you about the bags and he talked about
4  having to lift fifty pounds?
5     A. Yes, sir.
6     Q. And you are saying I can handle
7  it.
8     A. I can do this.
9     Q. Okay.
10    A. Yes, sir.
11    Q. Continue.
12    A. Okay. That's when he -- okay? So
13 I'm telling him that I can do this. You
14 know, I have experience in this and I can
15 do this.
16    Q. What is the next thing that you
17 remember him saying?
18    A. And he is saying to me -- because
19 I was pushing myself really.
20    Q. Okay.
21    A. And what he said to me was, ma'am,
22 we can't hire a woman for this position.
23 We just can't have a woman climbing up and

Page 83

1  down, lifting these bottles of water and
2  these bags all day.
3     Q. Now, those words you just --
4     A. Yes, sir.
5     Q. -- recited, those were the exact
6  words that he used?
7     A. Yes, sir. (Witness nods head.)
8     Q. And you are a hundred percent
9  positive about that?
10    A. Yes, sir. Yes, sir.
11    Q. And he said that while you were
12 trying to say I can handle it?
13    A. Yes, sir.
14    Q. And you said that he was laughing?
15    A. He laughed, yes, sir. He did.
16 His comment was, I know I shouldn't be
17 saying this and laughed. I know I
18 shouldn't be saying this. At that point
19 the conversation kind of dwindled away.
20 Thank you, sir, have a good day. I walked
21 out the door. I was so upset. There was
22 something on the door. I don't know what
23 it was. But as I opened the door and

Page 84

1  walked out, it cut my finger. And I went
2  and got in the car and I just sat there.
3  Michelle says what's wrong with you? I
4  said you would not believe what just took
5  place and I commenced into telling her.
6     Q. Did he tell you that you were not
7  permitted to fill out an application?
8     A. He would not -- he wouldn't let me
9  fill out on application.
10    Q. What do you mean?
11    A. He wouldn't give me the
12 opportunity to fill out an application.
13    Q. What do you mean?
14    A. Because he was telling me -- I
15 mean, he was telling me I can't -- we can't
16 hire a woman for this position. And I was
17 steady trying to prove to him that I could
18 do this. Just give me a chance. Just,
19 please, give me a chance, I can do this.
20 He wouldn't give me the opportunity -- he
21 wouldn't let me have the opportunity to
22 fill out an application.
23    Q. There are applications right there

Page 85

1 next to you?
2    A. Yes, sir. Now, I'm assuming
3 that's what that was. I seen — yes, you
4 know, that looked like applications on that
5 counter right there. Did I ever pick one
6 up and look at it? No, sir, I did not.
7    Q. Did he tell you, ma'am, I will not
8 permit you to fill out an application?
9    A. No, sir. He did not look at me
10 and say I'm not going to allow you to fill
11 out on application, ma'am. He said to me,
12 I cannot hire you. I cannot hire a woman
13 for this position. I just can't do it and
14 he laughed.
15    Q. Did you say, well, how about if I
16 fill out an application anyway?
17    A. At one point in time I did say
18 something to him about an application. He
19 shunned — he — I had said something to
20 him about filling out an application and
21 that's when he shunned me off. When he —
22 when he — you know, like led — like, I'm
23 speak to you. And I'm asking you a direct

Page 86

1 question. But you don't want to have to
2 answer that direct question, so you lead
3 into something else. That's what he did to
4 me.
5    Q. Better give me the words.
6    A. I can't — I can't — he did not
7 look at me and say, ma'am, you cannot fill
8 out an application.
9    Q. Did you say can I fill out an
10 application?
11    A. I had asked him could I fill out
12 an application.
13    Q. He did not say, no, you cannot?
14    A. He never did look at me and say,
15 ma'am, you cannot. He told me when I asked
16 that question, he told me and laughed,
17 ma'am, we cannot hire a woman for this
18 position.
19    Q. And then you left?
20    A. Yes, sir.
21    Q. Did Pete give you the impression
22 it was up to him as to who would be hiring
23 for that position?

Page 87

1    MR. WILSON: Object to form.
2    A. Yes he did.
3    Q. Did he say — what did he say that
4 led you to believe that?
5    A. When I had went in there and the
6 gentleman had leaned back, he was the one
7 that — he was the one that let me know
8 that Pete was the person in charge and that
9 Pete would help — that he would be helping
10 me, Pete would be helping me. And as that
11 point happened, Pete walked straight up to
12 the counter.
13    Q. Okay. So you assumed that if Pete
14 was the one that was supposed to help you,
15 it would be his decision as to who would be
16 hired?
17    A. Well, from the way he come across
18 he was the decision. He is the one that
19 told me, ma'am, I just cannot hire a woman
20 for this position. That is — that's what
21 he told me. I cannot hire a woman for this
22 position. I just can't do it. And laughed
23 and said, I know I shouldn't be saying

Page 88

1 this.
2    Q. What did the other man look like
3 sitting in the chair?
4    A. He was skinnier and taller, but
5 other than that I don't know.
6    Q. Was he in uniform?
7    A. I believe he was. Well, you know,
8 I believe that there was a name tag, a
9 patch on his shirt, but I didn't look that
10 close — that close.
11    Q. Okay.
12    A. But he was a more taller, lanky,
13 skinnier dude.
14    Q. Did you say to Pete after he
15 described the position to you that — that
16 didn't sound like a job for you?
17    A. No, sir, I didn't.
18    Q. Is it possible, Ms. Minton, that
19 he said I have never hired a woman for this
20 position?
21    A. No, sir.
22    MR. WILSON: Object to the form.
23    THE WITNESS: No, sir, that's not

22 (Pages 85 to 88)

FREEDOM COURT REPORTING

Page 89

1  what he said, sir. No, it is not.
2      Q.  Is it possible that he said no
3  woman has ever applied for this position
4  before?
5      A.  No, sir. No, sir.
6          MR. WILSON: Object to the form.
7          THE WITNESS: No, sir, he didn't
8  say that at all.
9      Q.  So you are a hundred percent
10 certain that he said I cannot hire a woman
11 for this position?
12         MR. WILSON: Object to form, asked
13 and answered.
14     A.  That's exactly what he said. I
15 cannot hire a woman for this position. I
16 just can't do it and laughed and then said
17 I know I shouldn't be saying this.
18     Q.  Have you ever talked to anybody
19 else at Culligan about that or about the
20 job?
21     A.  To Mr. Jay.
22     Q.  I meant before you filed the EEOC
23 charge. I know you talked to Jay Trumbull

Page 90

1  recently.
2      A.  No, sir.
3      Q.  You didn't call anybody to lodge a
4  complaint with the company itself?
5      A.  No, sir.
6      Q.  So what was the next thing you
7  did?
8      A.  That afternoon Michelle and myself
9  and Mason, we rode around and did a few
10 errands. Picked up something for supper
11 that night, and Michelle spent a few hours
12 at the house and her and I were talking and
13 I believe the next day, I called — I
14 called an attorney.
15     Q.  Would you look at Defendant's
16 Exhibit 3, whichever one it is, the EEOC
17 charge?
18     A.  This one, okay.
19     Q.  The information in paragraphs one
20 through six, that is information that you
21 provided; is that right?
22         MR. WILSON: Object. Asked and
23 answered.

Page 91

1      A.  Yes, sir.
2      Q.  Paragraph five says, I'm going to
3  read it and tell me if I mess up: Upon
4  information and belief Culligan has a
5  discriminatory policy of not hiring females
6  for available jobs. Moreover, the
7  respondent engages in a pattern and
8  practice of discriminating against female
9  job applicants on a class wide basis in
10 hiring. And you have declared under
11 penalty of perjury that the foregoing is
12 true and correct?
13     A.  Yes, sir.
14         MR. WILSON: Object to that last
15 question. I'm sorry.
16     Q.  What information do you have that
17 says Culligan has a discriminatory policy
18 of not hiring females for available jobs?
19         MR. WILSON: Object to the form.
20     A.  When I went in there that day
21 there wasn't one female. When I rode
22 around town, you never seen one female. On
23 all of their vehicles, everything you see

Page 92

1  is the Culligan man, the Cullman man. I
2  rode around town and every time I would see
3  a truck, I would look to see if there was a
4  female. You never saw not one female.
5      Q.  Because you never saw a female
6  driving a Culligan truck —
7      A.  I never saw a female, period.
8      Q.  Are you telling me there are no
9  females that work for Culligan?
10         MR. WILSON: Object to the form.
11     A.  Not to my knowledge.
12     Q.  The second statement: Moreover,
13 the respondent engages in a pattern and
14 practice of discriminating against job
15 applicants on a class wide basis in hiring.
16 What females have applied for jobs with my
17 client?
18         MR. WILSON: Object to the form.
19     A.  Could you ask that one more time,
20 please?
21     Q.  What females other than yourself
22 in filling out your application recently —
23     A.  Yes, sir.